## **AFFIDAVIT**

I, James D. Bedsole, being sworn, state:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since December 2020. I am assigned to the FBI's Boston, Massachusetts Field Office, where I investigate economic crimes, including business and securities fraud. At the FBI Academy in Quantico, Virginia, I received training in a variety of investigative and legal matters, including Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. Before joining the FBI, I worked for over four years as an attorney in private practice, handling securities litigation and regulatory matters. In connection with my work as an attorney, I conducted numerous reviews of complex financial transactions, including in cases involving allegations of financial misconduct and fraud.

2. This affidavit is being submitted in support of a criminal complaint charging DANIELLE NECOLE LIGGINS and CHARLES OCHI with conspiracy to operate an unlicensed money transmitting business, contrary to 18 U.S.C. § 1960, and in violation of 18 U.S.C. § 371.

3. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and from witnesses. In particular, I rely on the recording of a noncustodial interview of LIGGINS—in Houston, Texas on March 1, 2022—during which LIGGINS detailed her involvement in the scheme described below and admitted destroying evidence at OCHI's direction.

4. This affidavit does not set forth all of my knowledge about this matter. This affidavit is intended to show merely that there is probable cause to conclude that LIGGINS and OCHI conspired with each other and others known and unknown to operate an unlicensed money transmitting business.

1

## *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

### *General Background*

5. Texas law defines "money transmission" as "the receipt of money or monetary value by any means in exchange for a promise to make the money or monetary value available at a later time or different location, Tex Fin. Code § 151.301(b)(4). It also requires all persons conducting money transmitting businesses to be licensed, Tex. Fin. Code § 151.302, and punishes unlicensed money transmitting as a felony, Tex. Fin. Code § 151.708.

6. Federal regulations define "money transmitter" as a person who engages in "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." 31 C.F.R. § 1010.100(ff). Federal regulations require all money transmitting businesses to register with the Department of the Treasury, through its Financial Crimes Enforcement Network ("FinCEN"). 31 C.F.R. § 1022.380(a).

7. It is a federal crime to operate an unlicensed money transmitting business if: (1) the state in which it operates requires a license and punishes unlicensed operation as a misdemeanor or felony; (2) if a money transmitting business is not registered with FINCEN; or (3) if it involves the transmission of funds known to be derived from a criminal offense or intended to be used to promote or support unlawful activity. 18 U.S.C. § 1960.

8. At times relevant to this affidavit, LIGGINS lived in and around Dallas and Fort Worth, Texas; she currently lives in Little Rock, Arkansas. Based on her statements on March 1, 2022, LIGGINS's work history consists of employment at beauty salons, with no experience working in investments or banking. Based on public records that I have reviewed and her statements on March 1, 2022, LIGGINS holds a Texas cosmetologist license but does not hold a

money transmitting license in Texas or any other state. LIGGINS also told the FBI that she did not hold any other professional licenses.

9. OCHI lives in Grand Prairie, Texas. Based on public records that I have reviewed, OCHI did not hold a money transmitting license in Texas. I am not aware of OCHI holding a money transmitting license in any other state.

10. According to FinCEN's publicly available money transmitting business registrant database, neither LIGGINS nor OCHI registered as operating a money transmitting business, nor is there any record of which I am aware showing that either LIGGINS or OCHI worked as an agent for a FinCEN-registered money transmitting business.

11. In her recorded interview with the FBI, LIGGINS stated that at a date uncertain, she met "Charlie Otonar" ("Charlie") through an online dating website, and they began a romantic relationship. According to LIGGINS, she and "Charlie" communicated by phone as well as through messaging applications, including WhatsApp. LIGGINS identified "Charlie" as OCHI.

12. According to LIGGINS, OCHI told her that together they could run a business involving the cryptocurrency, Bitcoin.[1] LIGGINS told the FBI that she did not understand Bitcoin when OCHI suggested the business,[2] but she agreed to OCHI's plan and conducted monetary transfers for OCHI, at OCHI's direction. Based on LIGGINS' statements and my review of bank records, LIGGINS carried this out primarily by receiving funds by wire into her bank accounts, then withdrawing the money she received, and using the money to buy cashier's checks payable

---

[1] Based on my training and experience and on information received from other agents, I know that Bitcoin is a virtual currency that has been created and which circulates independently of a central bank or government. Bitcoin is purchased and exchanged by persons using peer-to-peer transactions and is valued through such transactions as a commodity, like gold, which holds value based on exchange.
[2] In her March 1, 2022 interview with the FBI, LIGGINS stated that she still did not understand Bitcoin.

to persons specified by OCHI. LIGGINS told the FBI that OCHI paid her about $1,000 per transaction. Additionally, I am aware that two wire transfers were sent from LIGGINS's bank accounts to investment fraud victims who have been interviewed by the FBI. Based on LIGGINS's statements that she never sent money from her accounts electronically, and that she provided her bank account passwords to OCHI, I believe that these transfers were carried out by OCHI or by persons working with OCHI.

13.     On or about October 17, 2017, LIGGINS opened a business bank account at Bank of America ("BOA") doing business as "Liggins Starfflex Commercial." In her interview with the FBI, LIGGINS stated that she did not know what "Liggins Starfflex Commercial" was.[3]

14.     On or about November 27, 2017, LIGGINS registered "Global Prime" as an unincorporated business in Tarrant County, Texas, and opened a business bank account at Regions Bank, doing business as "Global Prime," a name that OCHI suggested, according to LIGGINS. LIGGINS told the FBI that she never owned or operated a business and only obtained a business license and held a business bank account relating to OCHI's purported business.

*Ochi's Transmitting of Criminal Proceeds*

15.     Starting no later than about June 2016, persons in Nigeria operated a series of online investment fraud schemes that used websites and social networking platforms to steal money from small investors by promising to pay extraordinary returns by trading in binary options, cryptocurrency, and foreign exchange markets. The schemes were united by a common webmaster, who created websites and kept and maintained a central hub email address,

---

[3] There is a business registered as "Starfflex Commercial" in Tarrant County, Texas, that was registered by another individual. I am currently unaware of what connection, if any, there is between the unincorporated entity registered as "Starfflex Commercia" and "Liggins Starfflex Commercial."

4

alexanderutibassey@gmail.com, to coordinate the fraud scheme websites and the websites' administrative email communications. In the course of this investigation, I have reviewed many hundreds of emails from fraud schemes that flowed through the alexanderutibassey@gmail.com account.

16.     These schemes included, without limitation, PrimeFx, which operated through primefx.org and also was known as PrimeFx Managed System, PrimeFx Managed System Ltd., and Global Prime ("PrimeFx"). PrimeFx fraudulently solicited and then stole funds from persons in the United States, including in Massachusetts. It purported to facilitate trading in foreign currency ("Forex") and Bitcoin; the persons who controlled PrimeFx directed customers to deposit their funds into the personal bank accounts of "exchangers"; those "exchangers" then transferred victim funds to persons in Massachusetts, Maryland, Florida, and Texas, who used the funds to pay purported returns to earlier investors, spent the money, or transferred it overseas.

17.     The "exchangers" also received and transferred funds from other online schemes. As discussed below, these included, without limitation, myfixtrade.com and ultimateinvestments.org.

18.     The FBI has interviewed victims of the PrimeFx scheme, all of whom believed, based on representations made to them by persons purporting to work for PrimeFx, that PrimeFx would invest their money or engage in currency arbitrage, including cryptocurrency arbitrage. All of the victims sent money to persons as directed by PrimeFx for PrimeFx to invest, but never recovered their full investments, although some victims received small lulling payments.

19.     On or about June 29, 2017, a person purporting to work for PrimeFx and using the care@primefx.org email address informed a Massachusetts victim that PrimeFx offered a "BEGINNER package which assures you 10% - 20% ROI MONTHLY" and an "ADVANCED

package which assures you 30% - 60% ROI MONTHLY" and then directed the victim to send a "deposit" to the J.P. Morgan Chase Bank ("Chase Bank") account of OCHI's wife.

20.     On or about July 3, 2017, OCHI's wife's account received a $3,000 wire from the Massachusetts victim; on or about July 5, 2017, $3,300 was withdraw from that account; that same day, $3,000 was deposited into the account jointly held by OCHI and his wife at BOA; and that same day, $2,500 was transferred back to a co-conspirator in Massachusetts, who then, on or about July 7, 2017, wired $1,400 to an account at the Bank of China.  Of the $3,000 sent by the Massachusetts investor, OCHI and his wife kept $500, the co-conspirator in Massachusetts kept $900, the Chinese account received $1,400, and the Massachusetts victim received back $0.

21.     On or about October 14, 2017, a person purporting to work for PrimeFx emailed a Canadian investor directions to send her/his investment to OCHI's personal BOA account.  On or about October 18, 2017, the Canadian investor asked whether a transfer to OCHI was a "personal or commercial transaction," and a person using the PrimeFx.org email responded, "Commercial transfer, [t]he fact that the exchanger clears the sum under company supervisions."

22.     Bank records show that on or about October 20, 2017, OCHI received a wire for $4,945 from the Canadian investor in his personal BOA account.  Based on his bank records, OCHI did not invest the money he received.  Instead, he spent it by, among other things, transferring some small amounts to co-conspirators and by paying a real estate company what appears to be rent for either himself or a co-conspirator.

23.     Also on or about October 20, 2017, a person purporting to work for PrimeFx and using the PrimeFx.org email directed a victim investor in Massachusetts, who was investing on behalf of a parent, to send investment funds to OCHI.  On or about October 24, 2017, OCHI received a wire for $5,000 from a Massachusetts account into his BOA account.  Based on bank

records that I have reviewed, OCHI did not invest the money; instead, he transferred funds to a co-conspirator. The Massachusetts victim never recovered the investment.

24. OCHI also received fraud proceeds from other schemes, including something called, "Ultimate Investment." I interviewed a fraud victim from Florida who attempted to invest $5,000 in Bitcoin through UltimateInvestments.org in connection with a person using the name "Lorenzo Luca." I have reviewed the archived webpage for this domain using the publicly available Internet Archive Wayback Machine. UltimateInvestments.org purported to be an investment company promising up to 90% returns on investment. The Florida victim did not remember the name "Charles Ochi". However, bank records that I have reviewed show that on or about October 13, 2017, OCHI received a wire for $5,000 from the Florida victim, with the wire notation (which appeared on OCHI's bank statement) "Lorenzo Lucca Ultimate Investment." The bank records show that OCHI did not invest the funds he received; instead, he transferred $2,500 to a co-conspirator, $1,400 to his savings account, and $1,000 to another BOA checking account.

### *Ochi and Liggins's Transmitting of Criminal Proceeds*

25. On or about December 19, 2017, a North Carolina resident deposited $9,400 by wire into LIGGINS's Global Prime bank account, with the wire notation, "Investment."[4] Before this, the only money in the account was the original $1,000 deposited on December 1, 2017.

26. On or about December 20, 2017, a PrimeFx victim from Canada transferred $2,000 by wire into LIGGINS's Global Prime bank account. The Canadian victim emailed care@primefx.org after s/he sent the $2,000 wire to give notice of the deposit, and s/he received an email back from care@primefx.org stating that the funds were credited successfully to her/his

---

[4] Based on my review of bank records, this wire transfer was initially reversed due to an error in the wire instructions. The wire transfer was recorded as being completed on December 21, 2017.

beginner account. Before this deposit, the Global Prime account held $10,400, comprising the $1,000 account-opening deposit and the $9,400 deposit from the North Carolina resident described in the paragraph immediately above.

27.     On or about December 20 and 21, 2017, a prior PrimeFx victim in Massachusetts communicated by email to care@primfx.org with "John," a person purporting to work for PrimeFx, about a $25,000 withdrawal from a Bitcoin account that the Massachusetts victim had requested three weeks earlier.

28.     On or about December 27, 2017, the Global Prime account held by LIGGINS at Regions Bank wired $4,000 to the bank account of the Massachusetts victim who had requested the withdrawal. At the time that the money was wired, the only funds deposited into the Regions Bank Global Prime account were the $1,000 initial deposit and the $11,400 (less wire fees) from two prior investors. The $4,000 sent from the Global Prime account to the Massachusetts victim represented less than 25 percent of the money that the Massachusetts victim sought to withdraw, and the victim never recovered the full amount of the investment. Based on my experience and training, I know that paying returns to earlier investors with investment funds deposited by later investors, without any actual investment activity, is the defining characteristic of a Ponzi scheme.

29.     On or about February 16, 2018, Regions Bank closed LIGGINS's Global Prime account. At account closing, $7,512.86 was withdrawn. Based on the investigation to date, I do not know what happened to those funds.

30.     Based on my review of LIGGINS's bank records from Wells Fargo, Regions, and BOA in the relevant time period, I can identify no transactions involving purchase or sale of Bitcoin or any trading in options or futures.

31. I have identified other transactions performed by LIGGINS, apparently for OCHI, PrimeFx, and other schemes. For example, on or about December 7, 2017, LIGGINS's BOA account received a $15,000 wire from a myfixtrade.com victim in San Antonio, Texas. That same day, a PrimeFx victim from Florida, who had invested $30,000 in PrimeFx in November 2017, sent an email to care@primefx.org requesting a $5,000 withdrawal by wire from his/her PrimeFx account to his/her account at Chase Bank. On or about December 11, 2017, $5,000 was wired from LIGGINS's BOA account to the Chase Bank account of the PrimeFx victim in Florida. On or about December 12, 2017, the PrimeFx victim responded to an email from care@primefx.org that identified the wire as coming from LIGGINS's account and acknowledged receipt of the wire.[5] Based on my experience and training, I understand this transaction to be indicative of a Ponzi scheme, because PrimeFx and myfixtrade.com used funds apparently received from one victim to pay apparent returns to an earlier investor.

32. The other funds received by LIGGINS on December 7, 2017 were transferred out in the following manner on the following approximate dates:

    a. December 11, 2017, $4,000 and $3,000 withdrawn to cash; and

    b. December 14, 2017, $2,300 transferred from LIGGINS's account to OCHI.

33. As described above, LIGGINS and OCHI also transferred money for the entity myfixtrade.com, which, based upon a victim who I have interviewed, was a fraudulent investment company.

34. For example, on or about January 3 and January 5, 2018, LIGGINS's BOA account received two $15,000 wire transfers from a myfixtrade victim in California, who subsequently reported her/his loss to the FBI, and who I have since interviewed. According to that victim,

---

[5] The Florida victim never recovered the remaining $25,000 of her investment in PrimeFx.

9

myfixtrade.com operated through a website that promised a payout of 70 to 85 percent of investment on a monthly basis (minus a 20 percent commission).[6] LIGGINS's statement for her BOA account identified the wire transfers as "MYFIXTRADE.COM MFT GOLD INVESTMENT" and "MYFIXTRADE INVESTMENT NFP PROGRAM," respectively. Based on my experience and training, and my experience in this case, I know that "NFP" is short for "non-farm payroll" and that, in this context, an NFP investment is a speculative investment in binary options based upon the reported NFP number as an indicator for the overall economy.

35. Based on the bank records for LIGGINS's bank account, LIGGINS did not transfer the victim's money to a gold investment firm or to an options trader; rather, $8,000 was transferred to CC-1, a person previously convicted of mail fraud based on a different investment scheme; $5,000 was withdrawn; and the remainder, bundled with additional funds, was sent by cashier's check to a person in Chicago.

36. OCHI gave LIGGINS information about the victim's transfer of $15,000 and told her to send the money in two cashier's checks, each for $4,000, to CC-1's BOA account. Based on my experience and training, I know that a transfer that breaks up a sum and involves withdrawal and the use of cashier's checks is likely an effort to conceal the disposition of proceeds from one BOA account to another BOA account.

37. OCHI paid LIGGINS a cut of the transferred money as a fee. For example, by WhatsApp, OCHI directed LIGGINS to take $500 for a particular transfer, and LIGGINS responded that she would take $600 because OCHI was in arrears. She wrote, "You gave me 500 from the 15k yesterday I still haven't took the whole 1k from the last transaction. . . my balance was 700 I took 100 off yesterday now it's 600."

---

[6] The victim told me that s/he was only able to recoup $8,525 of her/his investment.

38. On or about January 22, 2018, OCHI used WhatsApp to tell LIGGINS about a $50,000 transfer from another victim in Los Angeles, California. OCHI told LIGGINS when the wire arrived; she responded, "I just saw it lol"; OCHI responded, "Too much money right lol [followed by two LOL emojis] Never seen that in ur life I bet."

39. On or about January 22, 2018, LIGGINS's BOA account received a $50,000 wire from the person in California identified by OCHI; it had the wire notation, "My Fix Trade." Those funds were then transferred out of LIGGINS's account in the following manner, on the following approximate dates:

   a. January 23, 2018, a $3,000 cash withdrawal; and a $15,000 cashier's check to an unknown person;

   b. January 24, 2018, a $6,500 cash withdrawal;

   c. January 25, 2018, a $2,500 transfer to OCHI and a $2,500 transfer to CC-2, a person who, based on PrimeFx emails and bank records I have reviewed, also received and laundered proceeds from the PrimeFx scheme;

   d. January 26, 2018, $9,000 in cashier's checks to OCHI;

   e. January 29, 2018, a $2,000 transfer to an unknown person;

   f. January 31, 2018, two cashier's checks totaling $8,000 to CC-1; and

   g. February 1, 2018, a $1,723 cash withdrawal.

40. Based on a screenshot provided to me by LIGGINS, it appears that OCHI directed LIGGINS to make the $8,000 transfer to CC-1 via two cashier's checks on or about Tuesday, January 30, 2018 over WhatsApp.[7] OCHI gave LIGGINS the name, account number, and bank for the $8,000 transfer to CC-1; LIGGINS responded, "k."

---

[7] A separate WhatsApp screenshot in which OCHI is instructing LIGGINS to send cashier's checks to CC-1 appears to relate to another transfer to CC-1 referenced above (*see* ¶ 35).

11

41. Based on bank records that I have reviewed, the transactions listed above are not consistent with investment of the $50,000 received by LIGGINS on or about January 22, 2018. For example, OCHI either withdrew or spent the $11,500 he received from LIGGINS' account, and OCHI received a $2,500 transfer from CC-2 on February 1, 2018, six days after CC-2 received $2,500 from LIGGINS's account. Based on my training and experience, such use of CC-2's account as a pass-through is characteristic of layering, a phase of money laundering designed to break up transfers and to make them harder to trace. CC-1 (*see* ¶ 39(f)) deposited the $8,000 received from LIGGINS's account on January 31, 2018, transferred $5,000 to Nigeria for "personal expenses" on February 2, 2018, and otherwise spent the money.

## CONCLUSION

42. Based upon the evidence set forth above, as well as my knowledge, training, and experience, I submit there is probable cause to believe that from at least June 2017 to present, LIGGINS and OCHI conspired with each other and others known and unknown to conduct an unlicensed money transmitting business, in violation of 18 U.S.C. § 371.

_____
James D. Bedsole
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me by telephone under Fed. R. Crim. P. 4.1 this __25__ day of April, 2022, at Boston, Massachusetts.

_____
Hon. Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts